UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PROTECT OUR COMMUNITIES FOUNDATION, et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>MICHAEL BLACK, Director, Bureau of Indian Affairs, et al.,<br><br>          Defendants. | Case No.: 14cv2261 JLS (JMA)<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL AND INTERVENOR DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>(ECF No. 59, 61, 64) |

  Presently before the Court are Plaintiffs' Motion for Summary Judgment, ("Pls.' MSJ") (ECF No. 59), Intervenor Defendants Tule Wind, LLC and Ewiiaapaayp Band of Kumeyaay Indians' ("Non-Federal Defendants") Joint Cross-Motion for Summary Judgment, ("Non-Fed. Defs.' MSJ") (ECF No. 61), and Federal Defendants' Motion for Summary Judgment and Cross-Motion for Summary Judgment,[1] ("Fed Defs.' MSJ") (ECF No. 64). Also before the Court are various responses and replies—Plaintiffs' Combined

---

[1] This filing also serves as Federal Defendants' Opposition to Plaintiffs' Motion for Summary Judgment. (*See* ECF No. 64.) For ease of labeling, the Court refers to this document only as Federal Defendants' Motion for Summary Judgment.

Opposition to Defendants' Cross-Motions for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment, ("Pls.' Opp'n & Supp.") (ECF Nos. 66, 67 (same document)); Federal Defendants' Reply in Support of Cross-Motion for Summary Judgment ("Fed. Defs.' Reply") (ECF No. 74); and Intervenor Defendants Tule Wind, LLC's and Ewiiaapaayp Band of Kumeyaay Indians' Joint Reply in Opposition to Plaintiffs' Motion for Summary Judgment, ("Non-Fed. Defs.' Reply") (ECF No. 75)—as well as Plaintiffs' Notice of Supplemental Authority Bearing on the Parties' Cross-Motions for Summary Judgment, ("Suppl. Auth. Notice") (ECF No. 68), and the relevant Administrative Record, (*see* ECF No. 72). The Court held oral argument on February 16, 2017, (ECF No. 78), and thereafter took the matter under submission.

Because (1) the Bureau of Indian Affairs ("BIA") permissibly relied on the 2011 Environmental Impact Statement ("EIS"), which it helped prepare; (2) the 2011 EIS rigorously considered Tule Phase II's potential risk to golden eagles; and (3) no new information or developments triggered NEPA's supplementation requirements, the Court concludes that BIA validly exercised its discretion in approving Tule Phase II. Accordingly, the Court **GRANTS** Defendants' Motions for Summary Judgment and **DENIES** Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

I.  **Factual Background**[2]

Tule Wind LLC plans to construct a number of wind turbines in southeastern San Diego County. (Pls.' MSJ 5.) The project consists of two phases. Phase I involves sixty-five turbines on federal land in the McCain Valley, and Phase II comprises twenty turbines on land held in trust for the Ewiiaapaayp Band of Kumeyaay Indians (the "Tribe") on ridgelines above the McCain Valley. (*Id.* at 5–6.) The Bureau of Land Management

---

[2] A more thorough account of the context underlying the facts specific to these particular Motions for Summary Judgment is contained in the Court's prior Order Granting Defendants' Motions for Judgment on the Pleadings. (ECF No. 50); *Protect Our Communities Foundation v. Black*, 14cv2261-JLS (JMA), 2016 WL 4096070, at *1–3 (Mar. 29, 2016 S.D. Cal.).

("BLM") approved Phase I in 2011. (*Id.* at 7–8.) This lawsuit pertains to BIA's approval of Phase II.

In 2011—prior to approval of either phase—BLM issued a Final Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA") and its implementing regulations. (*Id.* at 7.) BIA served as a cooperating agency on the EIS, which therefore permitted BIA to "use the EIR/EIS for [its own] approval processes" and "for consideration of [its own] required discretionary actions." (Tule 61–62.) Specifically, "portions of the Tule Wind Project will occur on lands under the jurisdiction of" distinct agencies, such that neither BLM nor BIA could independently authorize (or decline to authorize) the entirety of the Project. (*Id.*) "The BIA has jurisdiction over tribal lands and has a role in the approval of leases of tribal lands[,]" (*id.* at 105454), and therefore was the agency charged with discretionary consideration of Phase II.

The 2011 EIS provided that "[c]onstruction of [Phase II] would occur at those turbine locations that show reduced risk to the eagle population following analysis of detailed [eagle] behavior studies . . . ." (*Id.* at 624.) Ultimately, "all, none or part of the second portion of the product would be authorized" pursuant to "the discretion of . . . the appropriate land management entity." (*Id.*) Exercise of discretion was in turn controlled by "final criteria determining risk . . . to eagles" as "determined by . . . the appropriate land management agency, in consultation with the required resource agencies, tribes, and other relevant permitting entities." (*Id.*) "Turbine locations exceeding acceptable risk levels to golden eagles based on these final criteria [were] not [to] be authorized for construction." (*Id.*)

After the 2011 EIS, BIA continued to review the specifics of Phase II, collecting eagle telemetry data, creating and revising an Avian and Bat Protection Plan ("ABPP"), and opening several documents to public and agency comment. (*See id.* at 105454.) During this time, both the United States Fish and Wildlife Service ("FWS") and the California Department of Fish and Game ("CDFG") sent formal memoranda to BIA determining that "construction and operation of Phase II . . . has a high potential to result in injury or

mortality of golden eagles . . . and the loss of golden eagle breeding territories." (*E.g.*, *id.* at 106445, 111547.) FWS specifically noted that "Phase II of this project represents a high risk for golden eagle mortality and 'disturbance[,]' " (*id.* at 106447), that "[t]he conditions outlined in the [current] Draft . . . as presented would not likely meet the conservation standard of" relevant federal law, and that BIA's current risk characterization "could represent an underestimate of predicted" eagle deaths. (*Id.* at 106446–48.) Additionally, both FWS and CDFG recommended project modifications. (*Id.* at 111549 ("[T]he [CDFG] recommends the BIA remove turbines H-1 and H-2 as part of the Reduced Ridgeline Project."); *id.* at 106447 ("[FWS presents] [a] range of options to minimize risk to eagles . . . , including curtailment of some turbines during a portion of the breeding season and the elimination of all turbines with the exception of the six turbines proposed on State lands."); *id.* at 106446 ("[FWS] recommend[s] the Bureau of Indian Affairs and the project proponent considers a different turbine siting design or moving the project to another location to minimize and avoid eagle take.").)

Although BIA ultimately adopted several eagle-specific mitigation measures in authorizing Phase II, (*id.* at 105481–85), it did not agree with or adopt all of FWS's or CDFG's recommendations, (*e.g.*, *id.* at 107519, 105481–82, 105492–93). BIA instead determined that the adopted mitigation "scenario significantly reduces potential 'take' of golden eagles during operation for the life of the Proposed Action[,]" (*id.* at 105482), and that therefore Phase II "would not create significant impacts after the implementation of mitigation measures contained in th[e] ROD and the acquisition of all permits required by law." (*Id.* at 105454.) In authorizing Phase II, the BIA considered the EIS, the "overall administrative record," and "BIA's mission to foster economic development for tribes." (*Id.*)

## II. Procedural History

The Protect Our Communities Foundation and another plaintiff litigated the propriety of BLM's approval of Phase I in a separate action before this Court. *See Protect Our Communities Found. v. Jewell*, No. 13CV575-JLS (JMA), 2014 WL 1364453 (S.D.

Cal. Mar. 25, 2014). Ruling on summary judgment in March 2014, the Court held that BLM had satisfied its obligations under NEPA and that the defendants in that case did not violate the APA by failing to require Tule to obtain an eagle take permit because "[f]ederal agencies are not required to obtain a permit before acting in a regulatory capacity to authorize activity, such as development of a wind-energy facility, that may incidentally harm protected birds." *Id.* at *21. Plaintiffs' appeal of that order was recently affirmed by the Ninth Circuit. *Protect Our Communities Found. v. Jewell* ("*POCF I*"), 825 F.3d 571 (9th Cir. 2016).

Plaintiffs filed the instant Complaint on September 24, 2014, alleging three claims for relief: (1) that BIA violated NEPA, its implementing regulations, and the APA by failing to prepare any supplemental NEPA review; (2) that BIA violated the Eagle Act, its implementing regulations, and the APA by approving the lease in its ROD; and (3) that BIA violated the MBTA, its implementing regulations, and the APA by approving the lease in its ROD. (*See* Complaint at 28–32.)

Tule and the Tribe moved to intervene as defendants in November 2014 and December 2014, respectively. (ECF Nos. 10, 12.) The Court granted these motions in January 2015. (Order, ECF No. 22.) Tule, the Tribe, and BIA filed several Motions for Judgment on the Pleadings on August 28, 2015. (*See* ECF Nos. 33, 34, 35.) The Court granted these motions on March 29, 2016, dismissing Plaintiffs' second and third claims in their entirety and Plaintiffs' first claim to the extent it was based on their demands for supplemental NEPA analysis after BIA issued its ROD approving the lease. (*See generally* ECF No. 50.)

Plaintiffs and Defendants now all move for summary judgment regarding whether BIA acted arbitrarily and capriciously and contrary to NEPA and its implementing regulations in issuing the December 2013 ROD approving the lease.

/ / /

/ / /

/ / /

# LEGAL STANDARDS

## I. Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for

the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## II. Administrative Procedure Act

A Court reviews a plaintiff's claims under the Administrative Procedure Act ("APA") "[b]ecause the statutes under which [they] seek[] to challenge administrative action do not contain separate provisions for judicial review." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004). Under the APA, agency decisions must be upheld unless the Court finds that the decision or action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action taken "without observance of procedure required by law" may also be set aside. 5 U.S.C. § 706(2)(D).

Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*City of Sausalito*, 386 F.3d at 1206 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.' " *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). If the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made," a reasonable basis exists, such that the Court should not disturb the agency action. *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). "This deference is particularly appropriate when a court is reviewing 'issues of fact,' 'where analysis of the relevant documents

///

requires a high level of technical expertise.'" *POCF I*, 825 F.3d at 578 (quoting *City of Sausalito*, 386 F.3d at 1206).

Agencies are required to comply not only with laws they are charged with administering, but "<u>any</u> law." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis original). Importantly, however, "the only agency action that can be compelled under the APA is action legally required." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). Plaintiffs bear the burden of showing that agency action violated the APA. *Protect our Communities Found. v. Salazar*, No. 12CV2211-GPC PCL, 2013 WL 5947137, at *2 (S.D. Cal. Nov. 6, 2013) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).

# ANALYSIS[3]

Plaintiffs' extensive briefing effectively presents three overarching arguments: that (I) BIA violated NEPA by relying on the 2011 EIS for BIA's subsequent approval of Tule II; (II) BIA was obligated to prepare supplemental NEPA review; and (III) BIA violated NEPA's public disclosure requirements. (*See generally* Pls.' MSJ.) The Court addresses each in turn.

## I. BIA's Reliance on the 2011 EIS

Plaintiffs concede that BIA was a cooperating agency for purposes of the 2011 EIS, and that in certain circumstances a cooperating agency issuing a ROD "may rely on a lead agency's EIS to satisfy its own NEPA compliance obligations . . . ." (Pls.' MSJ 18.) However, Plaintiffs argue that in the present case BIA's exclusive reliance on the 2011 EIS was impermissible because (A) the EIS included Tule-II-specific mitigation measures with which BIA did not comply, and (B) the EIS did not consider a reasonable range of alternatives insofar as Tule Phase II was concerned. (Pls.' MSJ 18–29.) The Court addresses each argument in turn.

---

[3] Because the relevant facts and arguments almost completely overlap as between the varying Motions for Summary Judgment, the Court addresses the arguments in Plaintiffs' Motion as a means of discussing all arguments relevant to all pending Motions.

### A. The 2011 EIS's "Mitigation Measures"

Plaintiffs' argument focuses on one section of the EIS stating that the Phase II "[t]urbine locations exceeding the acceptable risk levels to golden eagles based on [specified] final criteria will not be authorized for construction." (Tule 625, 714.) As Plaintiffs see it, this language compels BIA to accept other agencies' high-risk classifications of Tule II as a complete bar to construction. (*E.g.*, Pls.' MSJ 21 ("BIA has run roughshod over this binding mitigation measure by rendering its consultation provision pointless . . . [and] authorizing turbine construction and operation in locations that plainly exceed acceptable risk levels according to the agencies with scientific expertise on that matter . . . ."). But Plaintiffs' construction of this EIS section ignores the immediately preceding language: "The final criteria determining the risk each location presents to eagles <u>will be determined by</u> the BLM or <u>the appropriate land management agency</u>, in consultation with the required resource agencies, tribes and other relevant permitting entities." (Tule 624, 713 (emphases added).) In the present case, BIA is the only agency with jurisdiction over the challenged portion of Tule II, and therefore is "the appropriate land management agency." And there is no question that BIA consulted with the required resources agencies, FWS and CDFG. (*See* Pls.' MSJ 20–22.) Plaintiffs instead disagree with how BIA used the consultation-obtained information. (*E.g.*, Tule 106445 (FWS concluding that "construction and operation of Phase II of the Tule Wind facility has a high potential to result in injury or mortality of golden eagles . . . and the loss of golden eagle breeding territories").)

However, BIA ultimately determined—as permitted by the EIS—that golden-eagle risk was "not . . . significant" in light of "the implementation of mitigation measures contained in th[e] ROD," and that any remaining risk was acceptable in light of the countervailing benefits flowing from approving the lease. (*E.g.*, *id.* at 105454, 105463–105465.) And that determination was absolutely within BIA's discretion. (*See id.* at 624 ("[A]uthorization for construction at each turbine location in the second portion will be at the discretion of . . . the appropriate land management entity."); *see also id.* at 106456

(FWS, <u>after</u> BIA had formally responded to FWS's initial post-EIS concerns, recommending certain actions "[i]n the event that BIA decides to move forward with approving this project" despite FWS's concerns).)

Further, Plaintiffs' characterization of BIA as an agency run rampant, (*e.g.*, Pls.' MSJ 21–22), is simply not supported by the record.[4] BIA took steps to mitigate the risk to golden eagles by imposing restraints on periods during which the turbines would operate and by requiring the tribe to apply for an eagle take permit. (Tule 624–25, 105455; *see id.* 105454.) And BIA did engage with FWS. (Tule 107518 ("The BIA appreciates [FWS's] focus on the impacts to golden eagles and other wildlife habitat, and acknowledges that such information will be one of the factors (including economic impacts) that the BIA in its trustee role will use in its review of the lease application."); *see id.* at 105464 ("This [BIA] ROD also contains additional mitigation measures . . . which are designed specifically to . . . ensure the minimization of impacts to golden eagles and other species . . . .").)

In short, the Court concludes that the EIS did not bind BIA's discretion in such a way that BIA could only authorize Phase II if it was deemed acceptable by FWS and CDFG. Instead, the EIS only required BIA to consult with FWS and CDFG and consider their comments, something the record adequately demonstrates BIA did.

### B. Reasonable Range of Alternatives

Plaintiffs first argue that the 2011 EIS did not consider a reasonable range of alternatives regarding Tule Phase II because the EIS represented only a "preliminary" assessment such "that BLM never intended" it "to serve as the required 'hard look' at a reasonable range of alternatives concerning a final decision by BIA as to" Tule Phase II.

---

[4] Along these lines, Plaintiffs argue that BIA's post-EIS statements "make clear that BIA <u>never</u> intended to consider any project modifications based on input from the relevant wildlife agencies . . . ." (Pls.' MSJ 21–22 (emphasis original).) However, rejecting FWS's recommendations does not equate to failing to consider them, even if the surrounding project developments and BIA-specific considerations effectively foreclosed a "zero turbine" build scenario. (*See* Tule 107518–19 (explaining BIA-specific considerations that were inharmonious with FWS's concerns).)

(Pls.' MSJ 24–29.) However, this argument is directly controverted by the record. In part, the EIS states that: "Responsible/cooperating agencies, including . . . BIA [and] Ewiiaapaayp Band of Kumeyaay Indians . . . will also use the EIR/EIS for their approval processes. . . . . Because portions of the Tule Wind Project will occur on lands under the jurisdiction of . . . the Ewiiaapaayp Band of Kumeyaay Indians, the BIA [and] Ewiiaapaayp Band of Kumeyaay Indians . . . will also use the EIR/EIS for consideration of their required discretionary actions." (Tule 61–62.) The EIS continues: "*Tule Wind Project Alternatives*[:] Of the 12 alternatives considered, the following 5 . . . have been selected for detailed analysis in the EIR/EIS. The BLM, BIA, Ewiiaapaayp Band of Kumeyaay Indians, [and other relevant agencies] have responsibility in making a decision on the proposed Tule Wind Project, including which, if any, of the five alternatives or variations and/or combinations of those alternatives evaluated in this EIR/EIS should be adopted." (Tule 74.) Furthermore, "[t]his EIR/EIS considers the full range of potential environmental impacts and issues for the Proposed PROJECT," and "[f]inal selection of . . . each of the project alternatives evaluated in the EIR/EIS . . . will be predicated by the final decisions made by each of the lead jurisdictions, CPUC, BLM, County of San Diego, California State Lands Commission, BIA, and Ewiiaapaayp Band of Kumeyaay Indians in their consideration of information presented in this EIR/EIS, as well as other factors, including purpose and need, engineering, economic cost/benefit, and public input." (Tule 90.) Also, "the Ewiiaapaayp Band of Kumeyaay Indians may use this EIR/EIS for their permitting/approval processes. As noted in the comment, the Ewiiaapaayp Band of Kumeyaay Indians has discretionary authority over the Tule Wind Project on tribal lands. Therefore, the Ewiiaapaayp Band of Kumeyaay Indians/BIA would act as the NEPA lead agency in consideration of portions of the Tule [Project] within their jurisdiction."  (Tule 3626.) Accordingly, the Court concludes that BLM intended the EIS to be a "hard look" for purposes of both Tule Phase I and II.

Plaintiffs also argue that, despite the EIS's clear intent to examine adequate alternatives for all aspects of the Tule Wind Project (i.e., both Phase I and Phase II), the

EIS's alternatives analysis was insufficient as to Phase II because it only considered zero- or eighteen-turbine builds and nothing in between. (Pls.' MSJ 26–29.) The Court does not agree.

As an initial matter, this argument is almost certainly precluded by the NEPA exhaustion doctrine. Although often identified by different names, such as "NEPA exhaustion," "waiver," and "issue preclusion," the general principle under any articulation of the doctrine is that it is improper for a plaintiff, "after failing . . . to bring the matter to the agency's attention, [to] seek[] to have that agency determination vacated on the ground that the agency failed to consider [those] matters . . . ." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978). This includes when a "plaintiff organization submitted comments, [but] those comments did not urge the agency to consider the alternatives that [the plaintiff organization] later raised in its claim that the EIS was insufficient." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006) (summarizing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004)).

In the present case, no Plaintiff objected to a lack of mid-range alternatives until this lawsuit, and there is no indication on the record that any other party made such objection prior to the issuing of the final EIS. (*See* Tule 5195, 110615 (cataloging Plaintiff comments).) This precisely mirrors the facts of the Supreme Court's unanimous decision in *Public Citizen*, 541 U.S. at 764–65; *see also Rumsfeld*, 464 F.3d at 1092, and therefore constitutes waiver of these objections for purposes of suit.[5]

/ / /

---

[5] At oral argument, Plaintiffs urged that the exception *Public Citizen* identified—"that an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action," 541 U.S. at 765—applies in the present case. (Hr'g Tr. 19:21–20:20.) Plaintiffs specifically pointed to the Ninth Circuit's embracing this exception in *Rumsfeld*. However, the instant case is very different than *Rumsfeld*, where "[t]he record . . . [wa]s replete with evidence that the [defendant] recognized the specific shortfall of the PEIS raised by [the] [p]laintiffs . . . ." 464 F.3d at 1092. By contrast, Plaintiffs here cite <u>no evidence</u> that prior to the 2011 EIS BIA was aware of any concern regarding a lack of mid-range alternatives regarding Phase II. Without such evidence, recognizing Plaintiffs' broad construction of the *Rumsfeld* exception would both directly contravene *Public Citizen* and almost completely swallow the exhaustion doctrine itself.

However, even if Plaintiffs' alternatives argument is not precluded, the EIS made clear the potential environmental impact under both zero- and eighteen-turbine builds, and left BIA the discretion to approve "all, none or part" of Phase II after considering pending "eagle behavior studies." (*Id.* at 624.) This provided guideposts as to the spectrum in which BIA was to work, as well as supplemental information that could help further inform discrete builds.[6] (*Id.* at 110192 ("The BIA has determined that the Proposed Action would not create significant impacts after the implementation of the mitigation measures contained in this ROD and the acquisition of all permits required by law. This decision is based on the BIA's thorough review . . . .").) This was in large part because the EIS considered both Tule Phase I and Tule Phase II together as one project, addressing five very distinct action alternatives within that global project context. And just as this Court and the Ninth Circuit previously held in the context of Tule Phase I, "the range of alternatives considered in the EIS was not impermissibly narrow, as the agency evaluated all 'reasonable [and] feasible' alternatives in light of the ultimate purposes of the project[,]" *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 580 (9th Cir. 2016) (quoting *City of Carmel–by–the–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)). Accordingly, the range of alternatives here complied with the NEPA requirement of

---

[6] At oral argument, Plaintiffs refined this argument, noting three Ninth Circuit cases that found alternative analyses lacking. (11:18–23; 18:2–19:20.) Each case is distinguishable: (1) *Muckleshoot Indian Tribe v. United States Forest Service*, took issue with the Forest Service's "impermissible . . . tiering" to several other documents to bolster their EIS, and "the Forest Service['s] fail[ure] to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration[,]" 177 F.3d at 810–14; (2) *Friends of Yosemite Valley v. Kempthorne*, took issue with the facts that the agency's " 'no-action' alternative [wa]s invalid under NEPA[,]" that "each of the three action alternatives [wa]s primarily based on [a document] which d[id] not adequately address" a critical component of the action, and that the agency "itself realized the 'need for a reasonable range of . . . alternatives because the original EIS did not look at alternatives for [the critical component][,]" 520 F.3d at 1038–39 (emphasis original); and (3) *Western Watersheds Project v. Abbey*, took issue with the agency's "decision not to consider a reduced- or no-grazing alternative at the site-specific level, having chosen not to perform that review at the programmatic level[,]" 719 F.3d 1035, 1050 (9th Cir. 2013) (emphasis added). In the present case, EIS analysis was not tiered, the EIS relied on extensive studies and data, and the EIS was explicitly drafted to consider project-wide effects in concert with each implementing agency's particular mission guiding their discretion.

fostering "informed decision-making and informed public participation." *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 871–72 (9th Cir. 2004).[7]

**II. Whether BIA Was Obligated to Prepare Supplemental NEPA Review**

Plaintiffs argue that even assuming BIA could permissibly rely on the 2011 EIS, BIA was nonetheless obligated to prepare supplemental NEPA review due to (A) significant post-2011 data and information and (B) substantial changes in the project design. (Pls.' MSJ 29–40.) The Court addresses each argument in turn.

*A. Post-2011 Data*

Plaintiffs argue that three particular pieces of post-2011 data triggered BIA's duty to supplement the 2011 EIS. (Pls.' MSJ 30–37); 40 C.F.R. § 1502.9(c)(1)(ii) (requiring an agency to prepare an EIS supplement if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions or impacts"). In particular, (1) FWS sent BIA two interagency memoranda noting FWS's concerns over Phase II's potential negative impacts to the golden eagle population, disagreeing with BIA's and Tule Wind LLC's estimate regarding eagle fatalities, and categorizing the project as "high-risk" for eagles and other birds, (Tule 106445–50, 106452–53); (2) CDFG's comments noting concerns over Phase II's potential negative impacts to the golden eagle population and recommending that BIA remove two turbines from the project, (*id.* at 111547–49); and (3) BIA's newly collected telemetry data, (*id.* at 107818 (2012 Third Quarter Eagle Telemetry Report); *id.* at 108837 (Fourth Quarter)).

---

[7] Plaintiffs cite to the D.C. Circuit's recent opinion in *Union Neighbors United, Inc. v. Jewell* for the proposition that failure to consider mid-range alternatives is fatal to NEPA compliance. 831 F.3d 564 (D.C. Cir. 2016). However, *Union Neighbors* does not alter the touchstone regarding "[j]udicial review of the range of alternatives considered by an agency[,]" which "is governed by a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a 'reasoned choice.' " *State of Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982). And *Union Neighbors* is easily distinguishable—unlike the present case, where the alternatives predict either no eagle harm, the potential for three eagle deaths, or "2.7–6.2 golden eagle" deaths over the entire project's lifespan, (Tule 110200, 106448), the alternatives at issue in *Union Neighbors* varied greatly in scale as likely taking no bats, 5.2 bats per year, and 12 bats per year—over 300 through the life of the project, *Union Neighbors*, 831 F.3d at 572–73. Furthermore, during the public comment period for the final EIS the *Union Neighbors* Plaintiffs <u>specifically asked</u> the relevant agency to consider more mid-range proposals. *Id.*; (*see* Pls.' MSJ 28 (noting same)).

However, although some of these data may indeed have been new, Plaintiffs gloss over the additional regulatory command that a supplemental EIS need be prepared only if the new information is also <u>significant</u>. *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 344 (9th Cir. 1996) (holding that supplementation was not required because there was no indication the new information would " 'affec[t] the quality of the . . . environment' in a significant manner or to a significant extent not already considered.' " (quoting *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 374 (1989))). Otherwise put, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh*, 490 U.S. at 373 (1989); *see also State of Wis. v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984) (explaining that to trigger mandatory EIS supplementation requires new information "provid[ing] a <u>seriously</u> different picture of the environmental landscape such that another hard look is necessary" (emphasis original)).

In the present case, each piece of post-2011 data Plaintiffs identify confirms or—at most—slightly augments the 2011 EIS's earlier concerns regarding potential eagle fatalities. The 2011 EIS noted that "biologically sensitive areas, including golden eagle . . . habitat[,]" were "[m]ajor issues discussed during th[e] process[,]" (Tule 67), and accounted for data collected from years of eagle surveys, (*see id.* at 445, 13786, 10865, 13808). The 2011 EIS therefore carefully considered eagle impacts, both under Phase I and Phase II, even addressing the worst-case scenario that the "northwestern area of the project could become a continuing sink for golden eagles attempting to use nesting sites west of the project area." (*Id.* at 621.) Additionally, the 2011 EIS required implementation of a 2011 Avian and Bat Protection Plan ("ABPP"), (*id.* at 105461), which in turn required future eagle monitoring and studies, (*id.* at 10758, 1767), which in turn was addressed by BIA both through public and agency comment and in its ROD, (*id.* at 105460, 108093).

Accordingly, viewed in the proper context, Plaintiffs' new information is not "significant" within the terms of the regulations—it merely confirmed concerns that the

2011 EIS already articulated and considered.[8] (*Compare, e.g.*, Tule 617 (2011 EIS noting that "[i]f the Canebrake [eagle] pair . . . continue to use their current nest . . . the adults and their fledglings are at extremely high risk of collision. It is anticipated that this territory would either be lost completely or would become an ecological sink"), *with, e.g.*, Tule 106445–67 (FWS memorandum noting that "construction and operation of Phase II of the Tule Wind facility has a high potential to result in injury or mortality of golden eagles . . . and the loss of golden eagle breeding territories" and that BIA's proposed mitigation measures "would not alleviate the potential loss of this territory"). At worst, FWS's comments indicate concern that an estimate of "2.7–6.2 golden eagle" deaths throughout the life of the project might be low. (*Id.* at 106448.) But the 2011 EIS already considered "unavoidable adverse impacts . . . [that] would be significant and unmitigable" regarding golden eagles. (*Id.* at 80.) And there is simply no evidence before this Court that FWS's later-expressed concern that the death-range estimate "<u>could</u> represent an underestimate of predicted take levels[,]" (*id.* at 106448 (emphasis added)), is significant within the meaning of NEPA regulations.

Given the foregoing, the Court concludes that Plaintiffs have not demonstrated any significant new information that would have required BIA to prepare a supplemental EIS.

### B. Project Design Changes

Plaintiffs next argue that BIA was required to prepare a supplemental EIS because the agency made "substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1)(i). Specifically, Plaintiffs argue that BIA authorized twenty commercial wind turbines on the tribal ridgeline, despite the EIS only authorizing construction and operation of up to eighteen turbines on the tribal

/ / /

---

[8] And telemetry data only "provides information as to the home range of individual[] [birds], but cannot be used in the fatality estimate." (*See* Tule 108587.) Accordingly, its relevance is limited to non-fatality-specific applications, and the worst-case habitat concern, that Phase II could create a continuing sink, was already addressed by the EIS.

ridgeline. (Pls.' MSJ 37–40.) But BIA provided a plain and rational explanation for this numerical discrepancy:

> While the Final EIR/EIS (FEIR/EIS) identified only 18 turbines as being located on the trust land, the FEIR/EIS analyzed the impact of siting 2 additional turbines in areas straddling BLM and trust lands, and therefore, this ROD anticipates that the final placement of those two turbines, which the EIS/EIR depicted as being located on BLM land directly adjacent to the trust land, may actually be on trust land within the area analyzed in the EIR/EIS after final engineering of the project is completed. Therefore, this ROD approves up to 20 wind turbines which may be sited on trust land, and which are consistent with the environmental evaluation completed as part of the NEPA process for the Project.

(Tule 110192.) And Plaintiffs' description of this explanation as a "cursory rationale[,]" (Pls.' MSJ 38–39), does not change the fact that it is in reality analytically sound and straightforward. The 2011 EIS considered both Tule Wind Phases at once, and considered up to twenty turbines on the ridgeline that at time splits the jurisdictional boundary between BIA- and BLM-managed land. (*See* Tule 2749–51.) The "Cumulative Scenario and Impacts" Section of the 2011 EIS demonstrates this with several "Wilderness and Recreation Cumulative Projects Overview Map[s]" depicting up to twenty-one turbines located on the tribal-jurisdictional side of the ridgeline. (*See id.*) Thus, the 2011 EIS contemplated up to twenty turbines on the ridgeline, particular jurisdictional classification notwithstanding. This is likely not a "change" within the meaning of the regulation, and certainly is not a "substantial" one. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011) ("[S]upplementation is not required when . . . the new alternative is a 'minor variation of one of the alternatives discussed in the draft EIS,' and . . . the new alternative is 'qualitatively within the spectrum of alternatives that were discussed in the draft [EIS].' ").

Accordingly, the Court concludes that Plaintiffs do not demonstrate a substantial change in the proposed action sufficient to require BIA to prepare a supplemental EIS.

///

### III. NEPA's Public Disclosure Requirements

Plaintiffs' final argument is that "BIA also violated NEPA and its implementing regulations by withholding from the public highly germane materials bearing on the environmental impacts of, and reasonable alternatives to, BIA's action in approving Tule Wind Phase II." (Pls.' MSJ 40–44.) In support, Plaintiffs cite broad policy statements from both the Code of Federal Regulations and various cases discussing NEPA's desired goal of encouraging informed decisionmaking and public participation. (*Id.*) However, NEPA's implementing regulations have channeled these general policy statements into specific requirements: agencies drafting an EIS must circulate a draft, provide notice of a length-compliant comment period, and address received comments in the final EIS. 40 C.F.R. §§ 1502.9(b), 1503.11, 1506.6, 1506.10(c). BIA here did that as a cooperating agency regarding the 2011 EIS, and the new information discussed above, *supra* Section II, does not fall within those regulatory requirements for the same reasons BIA was not required to prepare a supplemental EIS.[9]

### CONCLUSION

The Court recognizes that this case arises from Plaintiffs' genuine and deep concern for our shared environment and natural resources. And there is no question that NEPA and its implementing regulations were designed to give full consideration to such concerns by producing "coherent and comprehensive up-front environmental analysis to ensure . . . that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *POCF I*, 825 F.3d at 579 (quoting *Churchill Cty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)).

However, those NEPA safeguards were adequately observed in the instant case. All evidence points to a carefully considered BIA ROD, based on and calibrated by a 2011 EIS

---

[9] And BIA even went above and beyond the public disclosure requirements NEPA mandates. (Tule 105454 ("To ensure that the public has had an opportunity to review all of the key documents on which this [BIA] ROD is based, the PSABPP and the Fire Plan were made available for public comment from September 19, 2012, to October 19, 2012, and responses to those comments are included as part of this ROD.").)

that engaged in coherent and comprehensive analysis of potential eagle harms. Subsequent comments from federal and state agencies confirmed the 2011 analysis, and BIA in turn carefully considered both those comments and subsequently collected data, none of which triggered NEPA's EIS-supplementation requirement. BIA ultimately exercised its EIS-granted discretion to approve Tule Phase II in its entirety; but it did so with full knowledge of potential environmental impacts and after "consider[ing] the relevant factors and articulat[ing] a rational connection between the factors found and the choices made." *POCF I*, 825 F.3d at 578 (quoting *City of Sausalito*, 386 F.3d at 1206). This may be contrary to Plaintiffs' desired outcome, but it is not contrary to rational agency decisionmaking.

Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, (ECF No. 59), and **GRANTS** Defendants' Cross-Motions for Summary Judgment, (ECF Nos. 61, 64). Because this concludes the litigation in this matter, the Clerk **SHALL** close the file.

**IT IS SO ORDERED.**

Dated: March 6, 2017

Hon. Janis L. Sammartino
United States District Judge